[Cite as *State v. Fenderson*, 2026-Ohio-94.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No.  E-24-051

    Appellee                              Trial Court No.  20 CR 46

v.

Takye S. Fenderson                        **DECISION AND JUDGMENT**

    Appellant                             Decided: January 13, 2026

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Russel S. Bensing, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Takye Fenderson, appeals the

October 11, 2024 judgment of the Erie County Court of Common Pleas, convicting him

of murder with accompanying firearm and repeat-violent-offender specifications,

tampering with evidence, and having weapons while under disability.  For the following

reasons, we affirm the trial court judgment.

# I. Background

{¶ 2} Takye Fenderson was charged with having weapons while under disability, a violation of R.C. 2923.13(A)(2) and (B), a third-degree felony (Count 1); two counts of tampering with evidence, violations of R.C. 2921.12(A)(1) and (B), third-degree felonies (Counts 2 and 5); murder with firearm and repeat-violent-offender specifications, a violation of R.C. 2903.02(B) and (D) and 2929.02(B)(1), an unclassified felony (Count 3); and involuntary manslaughter with firearm and repeat-violent-offender specifications, a violation of R.C. 2903.04(A) and (C), a first-degree felony (Count 4). These charges arose from the October 24, 2019 shooting death of T.J. The matter was tried to a jury beginning August 5, 2024. The following evidence was presented at trial.

## A. T.J. dies after being shot in the chest.

{¶ 3} On October 24, 2019, at approximately 9:45 p.m., someone called 9-1-1 to report that a man had shot himself at 2014 or 2015 Foxborough Circle in Sandusky, Erie County, Ohio. Officers reported to the scene within about seven minutes and found a black male—later identified as T.J—lying on the ground in front of 2014 Foxborough Circle, Apartment 1. They observed a gunshot wound to his chest and either a bullet wound or exit wound to his lower back. T.J. was alive, but gurgling and struggling to breathe. He was treated at the scene by EMS and transported to a nearby hospital, where he died from his injuries at 12:31 a.m.

## B. Police collect evidence at the scene and interview witnesses.

{¶ 4} When officers arrived at the scene, they observed that T.J.'s shirt and jacket had been pulled off, with only the sleeves remaining on his right wrist, which struck

2.

officers as odd because it was cold that night. They noticed saliva on the ground next to the victim, an orange bracelet under him, and a Crown Royal bag nearby. More saliva was found dripping from a bush near the door to the apartment. There was a pool of blood near the victim. No firearms, shell casings, or projectiles were discovered at the scene even though 9-1-1 callers had reported that the victim had shot himself.

{¶ 5} A crowd of people had gathered around, but no one was able to identify the man, and no one claimed to have witnessed the shooting. Officers spoke to a woman named D.J., who lived in apartment 1 and was outside when officers arrived. She was eventually questioned at the police station. It was discovered that D.J. had called 9-1-1 at 9:43 p.m.—two minutes before the first 9-1-1 call was received—but either the call dropped or her phone battery died. D.J. was one of two women who spoke to the 9-1-1 operator during the 9:45 p.m. call. She denied knowing the victim.

{¶ 6} Another witness, H.C., lived nearby and told police that sometime between 9:30 and 9:40 p.m., he heard two shots, followed by people shouting and screaming. He heard a male and female talking or arguing and someone saying "stop, stop," "you draggin' him," "help him up," and "stop dragging." H.C. could not see the events clearly from his location because his view was obstructed by trees and the distance.

### C. T.J.'s death is ruled a homicide.

{¶ 7} An autopsy revealed that T.J. sustained two gunshot wounds. One entered his chest and exited his lower back; the other entered his left arm and lodged in his forearm. There was no evidence of soot, stippling, or gunpowder residue around the entrance wounds, indicating that the shots had been fired from an indeterminate range of

3.

fire. The bullet that struck T.J.'s chest was fired in a downward trajectory, piercing the left lung, liver, and pancreas, and grazing the left kidney. The arm wound tracked through the elbow into the forearm, where the bullet—later determined to be most consistent with a 9-millimeter Luger—lodged between two bones. T.J. had an abrasion on his right knee, and toxicology results showed a blood alcohol level of .19 and evidence of recent cocaine use. The manner of death was ruled homicide, not suicide.

### D. Police learn that Fenderson and T.J. were together that night.

{¶ 8} Police discovered that Fenderson and T.J. were close friends, and T.J.'s nickname was Unc. They learned that T.J. and Fenderson spent much of October 24, 2019, together. D.J.—one of the women who spoke to the 9-1-1 operator—is Fenderson's sister. D.J. told the 9-1-1 operator that she did not know the man who had been shot. In fact, T.J. and Fenderson had been at her apartment just minutes before the shooting. D.J.'s apartment was searched with her consent. No evidence was found.

{¶ 9} T.J.'s fiancée, N.H., testified that T.J. and Fenderson hung out every day for at least the last year before the incident. She said she had never met Fenderson, but admitted being jealous of the time T.J. and Fenderson spent together. T.J.'s sister, S.M., testified that T.J. and Fenderson were "besties," and she has known Fenderson all his life.

{¶ 10} D.S. is a good friend of Fenderson. He testified that on the evening of October 24, 2019, he went out with Fenderson and T.J., who he knew as "Unc." D.S. was out on bond in a federal case and had a 10:30 p.m. curfew, so he was very conscious of where he was all night and how long he was there. He testified that he picked up Fenderson and T.J., and they went to Kroger in Sandusky to buy alcohol. D.S. then

4.

provided precise times and locations from his phone's GPS, establishing the following timeline for the night:

- 6:00 to 7:12 p.m.: the three men attended a pumpkin carving party;

- 7:15 to 7:25 p.m.: D.S. went to Kroger to get more alcohol;

- 7:41 to 8:19 p.m.: the three men went to Kaman's Bar;

- 8:37 to 8:58 p.m.: the three men went to Daly's Bar;

- 9:19 p.m.: the three men went to D.J.'s apartment;

- 9:37 to 10:22 p.m.: D.S. left D.J.'s apartment to shower at his dad's house;

- 10:26 p.m.: D.S. arrived at his aunt and uncle's home in time for his curfew.

{¶ 11} D.S. testified that everyone was in good spirits that night. He observed no conflicts between Fenderson and T.J. He described the interactions between Fenderson and T.J. as positive, friendly, and jovial. He stated that at Kaman's Bar, "everything was cool," and T.J. and Fenderson were "just havin' a good time," "crackin' jokes," and even having a playful exchange about who loved the other more. He said, "I didn't see no conflict with – with them two at all." D.S. did recall, however, that while at Kaman's, an acquaintance, D.M., told D.S. to get T.J. out of there because he was so drunk.

{¶ 12} Police collected video surveillance from Kaman's and Daly's and a video from T.J.'s phone. The times reported by D.S. corresponded with the video evidence they collected.

5.

{¶ 13} T.J. had recorded a cell phone video at the pumpkin-carving party. The video captured Fenderson and others singing and dancing. Fenderson held a little girl and laughed and danced with her while T.J. spoke from behind the camera.

{¶ 14} D.S. was asked about an instance visible on a surveillance video from the parking lot of one of the bars, showing Fenderson and T.J. pushing each other and appearing to take jabs at each other. Swain said that they were "joking around, they was playin', they was being jovial, like 'I love you more than you love me,' and they was just like shadow, shadowboxing a little bit." He characterized this as "good banter," and pointed out that he was standing off to the side, laughing at their antics. D.S. said that it may have looked aggressive on camera, but he emphasized that it was not a serious confrontation, and was "just how we interact with each other"—not an indication of anger or confrontation. D.S. thought Fenderson and T.J. may have been bantering about a girl, but he said, "I know it wasn't a big issue." "It was like a joke, it was more of a joke, and they was like more like laughin'."

### E. T.J. may have had a gun in his possession that night.

{¶ 15} In a video from Kaman's, T.J. had something in his waistband that appeared to be a gun. At one point, he took it out and handed it to an acquaintance, D.M., who immediately put it down on a chair and left. D.S. insisted, however, that no one was carrying a firearm. He said he verified this with Fenderson and T.J. because he was worried about being in the vicinity of a firearm while out on bond.

{¶ 16} T.J.'s fiancée testified that T.J. sometimes carried a gun, but she did not know if he was carrying a gun on the day he was shot. She indicated that she had seen

6.

T.J. with a .380 gun a year before he died, but had never seen him with a 9-millimeter. She allowed the police to search her residence for firearms or ammunition, but none were found.

{¶ 17} T.J.'s sister, S.M., testified that T.J. was familiar with guns and was known to carry a gun. S.M. said that Fenderson called her just before 8:30 on the morning of October 25, 2019, and asked what was up with her brother. She wondered what he meant because she thought Fenderson and T.J. had been together. Fenderson told her that he had been out with his girlfriend in Fremont, but he said that earlier T.J. had been acting crazy and was "out of it," so he took his gun. S.M. told Fenderson that her brother had died, and Fenderson began sobbing. Fenderson expressed disbelief upon learning of T.J.'s death.

{¶ 18} S.M. testified that a couple of hours after speaking to Fenderson, she went to the scene of the shooting and spoke with Detective Nixon. She later went to the station for a recorded interview. S.M. testified that she told the detective about Fenderson's call and, specifically, his statement about taking T.J.'s gun because he was acting out. But the lead detective in this case, Eric Constante, testified that this was not in Detective Nixon's report and was not stated during S.M.'s recorded interview. Detective Constante testified that he first heard about Fenderson taking T.J.'s gun on July 27, 2020. S.M. also testified that on the night of the shooting, she heard the 9-1-1 call played on the news, and she heard Fenderson in the background shouting "Unc, no." Officers also recognized Fenderson's voice in the background in the 9-1-1 call, yelling "No, don't go! Unc! Unc!" Before the 9-1-1 call was disconnected, a woman yelled, "Don't move him!"

7.

{¶ 19} S.M. initially did not think Fenderson could harm her brother, but she became skeptical when she heard Fenderson's voice on the 9-1-1 recording when he had told her that he wasn't with T.J. Over the months, S.M. had multiple interactions with Detective Costante and discussed various leads and rumors she heard from people connected to the streets.

{¶ 20} While witnesses heard Fenderson's voice in the 9-1-1 recording, Detective Costante testified that Fenderson was on post-release control when this shooting occurred. Under the conditions of Fenderson's post-release control, he was not supposed to leave Lucas County. His presence in Erie County could have subjected him to arrest or to a hearing for a post-release control violation. Ultimately, a hearing was held and Fenderson was found to have violated the terms of post-release control by leaving Lucas County.

## F. Fenderson drove to Fremont to meet his girlfriend.

{¶ 21} Police obtained surveillance video from a parking lot near the apartment where T.J. had been shot. Detective Costante testified that it appeared to show Fenderson's green Ford Focus pulling out of the parking lot at 9:51 p.m., approximately one minute before police arrived at Foxborough Circle. Cell tower records obtained later showed that Fenderson drove from his sister's apartment to the Walmart in Fremont. Cellular data was requested from Fenderson's cell carrier on an emergency basis to determine his present location. It alerted officers that Fenderson was at 800 Everett Street in Fremont, Ohio.

8.

{¶ 22} The house at 800 Everett belonged to the mother of Fenderson's girlfriend, T.G. Police obtained an arrest warrant for Fenderson on an unrelated charge and went to the location to execute the warrant.

{¶ 23} Eventually, detectives were able to speak to T.G. She testified at trial that she had been dating Fenderson for a few months at the time of the incident. On October 24, 2019, she was working second shift from 3:00 to 11:00 p.m. She and Fenderson texted each other throughout that night and agreed to meet at Walmart near where she worked. Fenderson drove a green sedan to the Walmart, then got in T.G.'s car. He was wearing a white t-shirt. He did not have a coat on even though it was cold that morning. T.G. did not see Fenderson with any other clothing and she did not see a firearm. She did not know Fenderson to ever carry a firearm.

{¶ 24} Fenderson was upset and crying. He said that T.J.—who he called "Unc"— had shot himself. He told her that he was at his sister's apartment brushing his teeth, heard something, ran downstairs, and saw that T.J. had shot himself. T.G. had met T.J. a few times at the home of Fenderson's sister, D.J. Like T.J.'s fiancée, T.G. said that she sometimes got jealous because Fenderson spent so much time with T.J.

{¶ 25} While they were texting earlier that evening, T.G. and Fenderson planned to go to Applebee's when T.G. got off work, but T.G. realized that Fenderson was too upset. T.G. could not bring Fenderson to her house while her mother was home—T.G.'s mother did not approve of Fenderson—so they drove around to "waste" time until her mom left for work in the morning. While they were driving around, T.G. and Fenderson got into an argument because T.G. said that she did not want to be a part of whatever was

9.

going on. She said that Fenderson had a lot going on and she didn't want to be around him anymore. Fenderson got upset, got out of the vehicle, and started walking. T.J. gave Fenderson a fleece cardigan to wrap himself in; ultimately, she convinced him to get back into the car.

{¶ 26} T.G. and Fenderson left Fenderson's car at a Taco Bell close to where she lives. They often did this when Fenderson would visit her so that his car wasn't seen at her home. T.G. had a lot of clothes and shoes in her car. She moved her things into Fenderson's car. She explained that she had been pulled over before and her car had been subjected to a K-9 search. She figured that if they got pulled over and her car was searched, it would go more smoothly without all of her things in the vehicle.

{¶ 27} T.G. and Fenderson went to Denny's and ate inside. Surveillance video from Denny's confirmed this. At some point after leaving Denny's, they switched seats and Fenderson drove. He used her phone because his was dead. He called his sister and beginning just after 11:30 p.m., he called hospitals to try to check on T.J.'s condition. They then drove around some more. Afterwards, they parked at the Days Inn and fell asleep in the car. They realized that her heat wasn't working, so they switched cars and slept in his car. Once she knew her mother would be gone, they switched back to T.G.'s car, left Fenderson's car at the Taco Bell, and went to T.G.'s house.

{¶ 28} When they got to her house, T.G. lay down to go to sleep. Fenderson charged his phone. He called his mom and he talked to T.J.'s sister. T.G. did not recall if she was with Fenderson when he learned that T.J. had died.

10.

{¶ 29} At some point that morning, police came to her house and knocked on her window. She saw that her house was surrounded by police officers. Fenderson told her she did not have to let them in without a warrant. She opened the door and they said they were looking for Fenderson. She told them that they could not come in without a warrant. She was charged with obstructing evidence. After hiring a lawyer, the charges were resolved.

{¶ 30} Detectives would eventually search T.G.'s phone. Her text messages showed that she and Fenderson had plans to meet at 11:00 p.m. and they texted back and forth multiple times. At 9:41 p.m., Fenderson wrote his last text—a lengthy text about gathering paperwork to apply for jobs—before the 9:43 p.m. shooting. All of Fenderson's text messages to T.G. related to their plans to meet up and his attempts to get in the good graces of T.G.'s mother.

{¶ 31} Detectives were never able to search Fenderson's phone, however, because he broke it. Detective Constante said that Fenderson told him he broke it because he was upset that the police were there. Detective Constante conceded that he did not write this in his report.

### G. More evidence is collected and DNA testing is performed.

{¶ 32} Detective Roger Oddo was called on October 25, 2019, to assist in the service of an arrest warrant at the home of T.G. Afterwards, he went to the Denny's to collect surveillance video, then assisted with locating the green Ford Focus that Fenderson left at Taco Bell. Upon inspecting the vehicle, Oddo found and collected two

11.

blood droplets on the exterior of the driver's side passenger door handle, which appeared to be fresh blood. He turned the samples over to Sandusky detectives.

{¶ 33} David Hammond, a Special Agent with the Ohio Bureau of Criminal Investigation ("BCI"), further examined the vehicle at the Sandusky Police Department. The driver's doorhandle was broken. Hammond observed red-brown staining suspected to be blood on both the interior driver's doorhandle and the interior surface of the rear driver's side window. He collected samples. He also collected touch DNA samples from various parts of the vehicle, such as doorhandles, the steering wheel, and the gear shift; he did not look for or conduct any testing for gunshot residue in the car. No firearm, bullets, spent projectiles, or spent casings were found in the vehicle.

{¶ 34} Hammond examined the jacket that T.J. had been wearing. He was looking for gunshot residue using an infrared camera. None was found, suggesting that the gunshots had been fired from a distance inconsistent with contact or near contact. Hammond explained that gunshot residue is fragile and can be easily disturbed or removed, which may affect its detection. There was darkening at the bottom of the jacket visually consistent with blood.

{¶ 35} BCI scientists tested the evidence collected from the scene and from the search of the vehicle. The swab from the blood on the exterior door handle and interior window of Fenderson's car had a single DNA contributor. It was consistent with T.J.'s DNA. The swab from the blood on the interior door handle of Fenderson's car had a mixture of DNA—T.J. was the major contributor; the additional DNA was not of sufficient quality for comparison. The wristband had a mixture of DNA that was

12.

inconsistent with T.J., Fenderson, or D.S. The major contributor was an unknown male. Two swabs of saliva found at the scene had a single DNA contributor consistent with T.J. And the swab of saliva that was found dripping from a bush outside the apartment door had a single DNA profile consistent with Fenderson.

{¶ 36} Significantly, police had DNA samples on file for two other possible perpetrators—someone S.M. suspected and D.M, the man at the bar who said that T.J. needed to leave because he was too drunk. D.M. showed up at the scene of the shooting. There were no "hits" to indicate that either of these men was the source of DNA collected from the car or at the shooting scene.

{¶ 37} Examination of the clothing found at the scene—the shirt and jacket that had been found around T.J.'s right wrist—had bullet perforations and blood on them. Fenderson's black jacket that he had been seen wearing in the videos was never found.

**H. The jury reaches a verdict.**

{¶ 38} The jury found Fenderson guilty of all counts. The court merged Counts 1, 3, and 4 for purposes of sentencing. It sentenced Fenderson to a definite prison term of 24 months on Count 2; an indefinite prison term of 15 years to life on Count 3, plus three additional years on the accompanying firearm specification; and a definite prison term of 24 months on Count 5. The court found Fenderson to be a repeat violent offender, and imposed an additional definite prison term of two years on that specification. The court ordered that Counts 2 and 5 be served concurrently with the term imposed on Count 3, and ordered that the terms imposed for the specifications be served consecutively to the

13.

term imposed for Count 3, to one another, and to prison terms imposed in Erie County case No. 2019 CR 0393.

{¶ 39} Fenderson appealed. He assigns the following error for our review:

> The trial court erred in entering a conviction of murder which was against the manifest weight of the evidence, in derogation of Defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16 of the Ohio Constitution.

## II. Law and Analysis

{¶ 40} Fenderson argues that his convictions are against the manifest weight of the evidence. He maintains that the jury lost its way in convicting him, particularly because it failed to offer a motive, direct evidence, or a satisfactory explanation for why Fenderson would kill T.J., who, according to the undisputed evidence, was his close friend. He insists that in a manifest-weight review, we should not defer to the jury's credibility determinations because to do so transforms the analysis into a sufficiency review.

## A. Standard of Review

{¶ 41} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the

14.

conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172*,* 175 (1st Dist. 1983).

{¶ 42} We often caution that while under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). We also routinely recognize that "jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 43} Fenderson argues that Ohio courts mistakenly defer to the jury's credibility findings in manifest-weight reviews. He maintains that as a "thirteenth juror," the appellate court must weigh the evidence and assess credibility rather than merely defer to the jury. Fenderson urges that routine deference negates the appellate court's review function and flies in the face of the manifest-weight concept. Fenderson emphasizes that

15.

he is not proposing a new standard for manifest-weight review and clarifies that his position is grounded in *Thompkins*.

{¶ 44} The State responds that even acting as a "thirteenth juror," precedent requires appellate courts to extend special deference to jury credibility determinations because of the jury's unique position to observe witnesses. It disputes Fenderson's suggestion that no deference should be given to the factfinder and insists that it is appropriate to apply a presumption in favor of the factfinder. The State insists that reversal must be reserved for exceptional cases where the evidence weighs heavily against conviction. It suggests that unless there is conflicting evidence, there is no need for the appellate court to serve as a "thirteenth juror" and scrutinize the factfinder's resolution of conflicting testimony.

{¶ 45} Despite Fenderson's insistence that the jury's credibility findings are owed no deference in a manifest-weight review, the Ohio Supreme Court has instructed otherwise. In *In re Z.C.*, 2023-Ohio-4703—a permanent custody case employing a manifest-weight review—the Court reminded that "'[i]n weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.'" *Id.* at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21. It explained that deference is owed to the factfinder because the finder of fact "'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). It cautioned that when evidence is susceptible

16.

to more than one interpretation, we must assign the interpretation that is most consistent with the verdict. *Id.,* quoting *id.* at fn. 3.

{¶ 46} We cannot ignore this relatively recent guidance from the Ohio Supreme Court. Accordingly, we will review Fenderson's assignment of error in a manner consistent with our usual practice, which is to extend deference to the jury's credibility determinations.

## B. The Evidence

{¶ 47} Fenderson offers several reasons why his convictions are against the manifest weight of the evidence. First, while acknowledging that motive is not an element that the State is required to prove, Fenderson argues that he lacked motive to kill T.J. given that the undisputed evidence demonstrates that they had a close friendship. Second, he maintains that no witness placed him at the scene at the time of the shooting; to the contrary, T.G. testified that Fenderson told him that he was upstairs in the apartment brushing his teeth. Third, although conceding that circumstantial evidence is afforded the same probative value as direct evidence, Fenderson claims that no direct eyewitness or forensic evidence linked him to the shooting, there was no evidence he possessed a gun that night or ever, and no weapons were recovered during police searches. He highlights testimony that the bullet extracted from T.J.'s body was a 9-millimeter and T.J.'s gun—which the State posits Fenderson used in the shooting—was a .380. Fourth, Fenderson emphasizes that the State made no effort to recover his clothing for gunshot residue or to further test physical evidence. Fifth, Fenderson explains that he left the scene because he was on post-release control, and his presence in Erie County

17.

itself was a violation. He maintains that T.J.'s blood found on his car proves only contact—it does not prove that he shot T.J. Finally, Fenderson suggests that D.M. and T.J. may have had "bad blood," yet no DNA standard was collected for D.M.

{¶ 48} In response, the State first questions the strength of Fenderson and T.J.'s friendship given that the two had only been close for about a year, T.J.'s fiancée had not even met Fenderson, and video evidence shows that they engaged in confrontation that night. It suggests that alcohol may have played a role in the shooting. Second, it emphasizes that Fenderson's presence at the scene as evidenced by the 9-1-1 call, the presence of his saliva near the scene, and the discovery of T.J.'s blood on his car, all established his presence at the scene of the shooting. It argues that Fenderson's claim that he was upstairs when the shooting occurred was disproved by the autopsy, which showed that this was a homicide, not suicide. Third, the State disputes that the bullets could only have come from a 9-millimeter gun and points to evidence showing that the use of .380 rounds could not be conclusively ruled out. It stresses that while Fenderson may not have had a gun, T.J. did, that gun was missing, and Fenderson had ample opportunity to dispose of both the weapon and his clothing. And it emphasizes S.M.'s testimony that Fenderson told her that he took T.J.'s gun away from him because he was acting crazy. It observes that while T.J. may have carried a .380 a year ago, this does not mean that he did not now carry a 9-millimeter. Fourth, it contends that Fenderson's consciousness of guilt was demonstrated by his fleeing the scene, destroying his phone, and disposing of his black jacket, all of which were attempts to hinder the investigation, and it suggests that lies told by Fenderson's sister—that she did not know the victim and

18.

that he shot himself—were to protect Fenderson. Fifth, the State claims that T.J.'s blood found on Fenderson's car is evidence of Fenderson's direct involvement. Finally, the State disagrees that there was evidence of bad blood between D.M. and T.J., emphasizes that D.M.'s DNA was already in the database, and points out that there was no evidence that D.M. and T.J. interacted after the men left Kaman's.

{¶ 49} Fenderson replies that the State is simply trying to downplay the friendship between T.J. and Fenderson when all the record evidence shows that they were lifelong and close friends. It disputes that T.J. and Fenderson were involved in multiple confrontations that night; rather, D.S. described any physical contact between them as playful and non-serious. He argues that the blood found on his car may be explained by Fenderson tending to the wounded victim, which the State's own forensic expert admitted was possible. Finally, Fenderson insists that credibility was not at issue here, and the convictions were imposed without any evidence of motive or plausible explanation for how Fenderson committed the crime.

{¶ 50} Despite Fenderson's contention to the contrary, there were, in fact, credibility determinations to be made here. The jury had to decide whether Fenderson and T.J. were—as D.S. testified—engaging in banter or whether the videos depicted friction between them. They had to determine whether Fenderson told S.M. that he had taken T.J.'s gun because he was "acting crazy" They had to consider whether Fenderson's explanation for leaving the scene of the shooting and breaking his phone was plausible or whether these actions evidenced consciousness of guilt. And they had to assess why Fenderson and his sister would report to others that T.J. had shot himself

when there was no gun in the vicinity and why Fenderson would lead S.M. to believe that he had not been with T.J. when blood smears on his car demonstrated that he was at the scene of the shooting.

{¶ 51} The jury was presented with two versions of events. The State's version was that after a night of heavy drinking, tension grew between T.J. and Fenderson, culminating in Fenderson using T.J.'s own gun to shoot T.J. Afterwards, Fenderson fled to avoid detection, discarded the gun and his bloody clothes, then broke his cellphone to conceal evidence from police. Fenderson's version of events was that he was upstairs brushing his teeth in the bathroom when he heard a gunshot. He went out and tended to his friend—getting blood on his hands and clothes—but left before emergency vehicles arrived because his presence in Erie County violated the conditions of his postrelease control.

{¶ 52} In sum, the evidence was susceptible to more than one interpretation. As instructed by the Ohio Supreme Court, we must assign the interpretation that is most consistent with the verdict reached by the jury, who had the advantage of seeing the witnesses testify and using their senses to evaluate their credibility. Here, we cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that reversal is required. We conclude that Fenderson's convictions are not against the manifest weight of the evidence.

{¶ 53} Fenderson's sole assignment of error is not well-taken.

20.

## III. Conclusion

**{¶ 54}** Despite Fenderson's claims to the contrary, under a manifest-weight review, we must extend deference to the fact-finder's credibility determinations and assign an interpretation of the evidence that is most consistent with the verdict. Applying this standard, we conclude that Fenderson's convictions are not against the manifest weight of the evidence. Fenderson's assignment of error is not well-taken.

**{¶ 55}** We affirm the October 11, 2024 judgment of the Erie County Court of Common Pleas. Fenderson is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Christine E. Mayle J. | |
|---|---|
| | JUDGE |
| Myron C. Duahrt, J. | |
| | JUDGE |
| Charles E. Sulek, J. CONCUR. | |
| | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.